UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,

   *Plaintiff*,

v.                                               Case No. SA-21-CR-00521-JKP-1

(1) ANGEL LEWIS RODRIGUEZ,

   *Defendant*.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Angel Lewis Rodriguez's Corrected Motion to Suppress. ECF No. 55. The United States Government filed a Response, to which Rodriguez filed a Reply. ECF Nos. 62, 65. The Motion therefore is fully briefed and ripe for ruling. The Court held a hearing on the Motion February 20, 2025. After due consideration of the parties' briefings, the applicable law, and the testimony produced at the hearing, the Court **DENIES** the Motion. *See* ECF No. 55.

### BACKGROUND

On October 22, 2021, U.S. Drug Enforcement Administration (DEA) Officer Bryan Smith applied for and received a search warrant for 3422 E. Commerce St. ("the location"), a San Antonio business frequented by Defendant Angel Lewis Rodriguez. The primary basis for the search warrant was information from an informant that crack cocaine had been observed at the property within the prior 24 hours. Defense Exhibit No. 1, the "Search Warrant and Affidavit." The warrant was signed at 6:06 a.m. and at approximately 6:30 a.m. members of the DEA Task Force Group D54 conducted surveillance of the location. Around 8:00 a.m., a Ford

Explorer arrived at the location and left several minutes later with the occupants remaining in the vehicle.

The Ford Explorer traveled a half mile down the road, stopping at a nearby Circle K gas station. At the gas station DEA officers detained Defendant, who was in the passenger seat of the Ford Explorer, and patted him down for weapons. During the pat down, agents discovered approximately 38.8 grams of marijuana in Defendant's pocket. Agents advised Defendant of the search warrant for the location. Agents then read Defendant his *Miranda* rights, Defendant stated he understood his rights, and Defendant provided agents with a key to the location. Agents then transported Defendant to the location.

At the location, agents used Defendant's key to enter the business and agents again read Defendant his *Miranda* rights. Once the scene was secure, a Live Oak Police Department officer conducted a search with his canine. The canine immediately alerted to numerous locations throughout the building.

During the search of the location, agents found the following:

1. 123.4 grams of crack cocaine (92.12 grams lab weight) hidden behind an unpainted wall inside three sandwich bags;

2. 287.1 grams of cocaine (255.8 grams lab weight) inside a backpack on the floor behind the unpainted wall, as pointed out by Defendant;

3. $5,674 of U.S. Currency; and

4. Drug paraphernalia, including cocaine residue, scales, and plastic bags, underneath a sink.

While the search was being conducted at the location, agents interviewed the driver of the Ford Explorer—who is also its registered owner and Defendant's wife—at the gas station. The driver consented to a search of the Ford Explorer. During the search, a DEA officer recovered a 9 mm semi-automatic Heckler & Kock firearm from underneath the passenger seat where

Defendant had been sitting. The driver stated the firearm belonged to Defendant. Later, the firearm was confirmed stolen.

Following the searches, Defendant stated to agents the U.S. Currency located was drug proceeds. He also claimed ownership of all the narcotics recovered. Defendant also stated the firearm belonged to him and he purchased it two months prior for $300. Although Defendant did not see the firearm after agents found it, he described its appearance as "tan in color" and provided a detailed description of the firearm.

## BURDEN OF PROOF

The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *United State v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (*quoting* U.S. Const. amend. IV). The exclusionary rule, a judicially created deterrence measure, provides that evidence obtained by an unreasonable search or seizure generally may not be used as evidence of guilt at trial. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Weeks v. United States*, 232 U.S. 383, 393 (1914). Warrantless searches and seizures are *per se* unreasonable subject to certain narrow exceptions. *Cotropia v. Chapman*, 978 F.3d 282, 286 (5th Cir. 2020) (quoting *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002)). The government bears the burden of showing an exception applies. *United States v. Roberts*, 612 F.3d 306, 309 (5th Cir. 2010) (quoting *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005)).

## DISCUSSION

In this case, Defendant challenges: (1) the propriety of his initial search and seizure at the gas station; (2) the validity of the search warrant affidavit accompanying the search warrant for

the location; (3) the admissibility of evidence obtained through statements he made while detained; and (4) the voluntariness of his wife's consent to search the Ford Explorer.

In its Response to Defendants' Motion to Suppress, the Government concedes Defendant's initial search and seizure at the gas station was improper. However, the Government argues the underlying search warrant for the location was valid. Therefore, despite Defendant's improper detention at the gas station, it is the Government's position any evidence gathered at the location is admissible pursuant to the inevitable discovery doctrine.

For the reasons discussed herein, the Court agrees with the Government's position and finds the evidence should not be suppressed.

### I. The Initial Search and Seizure at the Gas Station

As stated, the Government concedes Defendant's initial search and seizure at the gas station was improper because it was unsupported by probable cause and outside the immediate vicinity of the location to be searched pursuant to the search warrant. *See Bailey v. United States*, 452 U.S. 692 (2013). As a result, the Court suppresses evidence of the marijuana found on Defendant's person during the initial pat down at the Circle K gas station (38.8 grams) and any statements Defendant made during his brief detention prior to waiving his *Miranda* rights.

### II. The Search Warrant

The narcotics located in this case were found pursuant to a search warrant that articulated probable cause for the search of the location. After the initial narcotics were found at the location, Defendant pointed out to agents a backpack on the floor behind the unpainted wall containing additional narcotics. This assistance did not occur during his improper detention at the gas station. Instead, Defendant's assistance occurred after law enforcement found initial evidence of a crime pursuant to the search warrant for the location. At that point, law

enforcement already developed probable cause to arrest Defendant. Moreover, even if Defendant's assistance occurred as a result of his initial search and seizure at the gas station, which the Government concedes was improper, the narcotics still would not be suppressible due to the applicability of the inevitable discovery doctrine.

    A.    **Reliance on the Search Warrant**

Regarding the search warrant affidavit, Defendant argues it is an invalid "bare bones affidavit" lacking in probable cause. To qualify as a "bare bones" affidavit, affidavits must be "so lacking in indicia of probable cause as to render belief in its existence entirely unreasonable." *United States v. Cherna*, 184 F.3d 403, 408 (5th Cir. 1999); *see also United States v. Moore*, 805 F.3d 590, 594 (5th Cir. 2015). "Bare-bones" affidavits typically contain "wholly conclusory statements, [lacking] the facts and circumstances from which a magistrate can independently determine probable cause." *Moore*, 805 F.3d at 594. The affidavit in this case provided a direct link between the location, the Defendant, and the narcotics; established the narcotics had been viewed at the location within hours of applying for the warrant; and provided the basis for relying on the eyewitness. The Court, therefore, finds the warrant affidavit was valid.

Defendant next argues the affidavit fails to establish a legal connection between Defendant and the location. To the contrary, the affidavit states the location to be searched is "under the control and charge of" Defendant. The affidavit details Defendant's control by stating the eyewitness notified law enforcement Defendant possessed crack cocaine at the location; the informant had seen the narcotics within the past 24 hours; and Defendant was observed at the location by case agents during the investigation.

Finally, Defendant argues the affidavit does not "specify where the Defendant was in possession of the drug and insinuates that it may have been at the Defendant's residence, rather

than the business location." This reading of the affidavit, however, is inaccurate. In the first paragraph of the sworn attestation, the affidavit states the affiant "receive[d] information from a credible and reliable person concerning Crack Cocaine being possessed at the above location by Angel RODRIGUEZ." Defense Exhibit No. 1, the "Search Warrant and Affidavit." It then states, in a later paragraph, "[t]he informant pointed out the residence…. The informant stated he/she did within the past 24 hours prior to this date, has seen (sic) a controlled substance to wit: Crack Cocaine is unlawfully possessed by Angel RODRIGUEZ." *Id*. Understandably, the use of the word "residence" in the affidavit may be confusing when read out of context and was most likely an error. However, when read in the context of the prior statements in the affidavit, the use of "residence" is clearly meant to refer to the location and the fact the narcotics, as noted earlier, were seen at the location for which the warrant is being sought.

      The affidavit, though succinct, is appropriate for this type of investigation. It lists timely information from a credible source and why the source is credible. It further supplements the information with additional support from the investigation, including criminal history searches and actual surveillance. In addition, the information is supported by the training and experience of the affiant. The Court, therefore, finds the affidavit clearly establishes probable cause.

      Moreover, under the good faith exception, the Fourth Amendment does not require suppression of evidence obtained by law enforcement's objectively reasonable reliance on a warrant, even if that warrant is unsupported by probable cause. *See United States v. Leon*, 468 U.S. 897, 922 (1984). Here, the Court finds the good faith exception would apply, as there is no evidence that the agents' reliance on the warrant was objectively unreasonable.

      **B.**    **Inevitable Discovery**

Agents read Defendant his *Miranda* rights prior to being brought to the location and, after the first set of narcotics were found hidden behind an unpainted wall, Defendant pointed out to agents a backpack on the floor behind the unpainted wall containing additional narcotics. Even if Defendant's cooperation was somehow improper, the narcotics themselves should not be suppressed, as they are subject to the inevitable discovery doctrine. *See, e.g., United States v. Walker*, 49 F.4th 903 (5th Cir. 2022). In this case, the agents had a narcotics canine on scene. The canine already alerted to numerous areas and was still available for the search. Further, the agents themselves discovered narcotics in close proximity to the backpack moments earlier. Given the agents conducted a thorough search in this case by even checking hidden areas, and that backpacks are frequently used to hold narcotics, the agents certainly would have searched the backpack on the floor behind the unpainted wall and discovered the narcotics without Defendant's assistance. Therefore, the narcotics found in the backpack should not be suppressed.

**III.     The Defendant's Statements**

Regarding statements made by Defendant, Defendant argues this evidence must be suppressed. A Defendant's statements made while in custody are inadmissible unless the Government can show the Defendant waived his *Miranda* rights "voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 445 (1966). In this case, agents read Defendant his *Miranda* rights at the gas station immediately upon advising Defendant of the search warrant for the location. This took place prior to Defendant's transport to the location. There is no evidence Defendant misunderstood his rights or involuntarily waived them. As a result, the Court finds Defendant's statements made after he waived his *Miranda* rights should not be suppressed.

**IV.     The Consent to Search**

Regarding the firearm officers recovered, Defendant challenges the voluntariness of his wife's consent to search the Ford Explorer ("Explorer"). Specifically, at the hearing on the Motion February 20, 2025, ("the hearing") Defendant testified he and his wife were handcuffed during their interaction with law enforcement at the gas station. Thus, Defendant argues his wife's ability to voluntarily consent was limited. According to his testimony, Defendant's hands were restrained behind his back while his wife's hands were restrained in front of her.

Defendant submitted as Exhibits to the hearing ATF Agent Kaitlin O'Connell ("Agent O'Connell") and TFO David Camacho's ("Officer Camacho") reports which provide the Court additional insight. *See* Defense Exhibit No. 2, the "ATF Report;" Defense Exhibit No. 3, the "DEA Report."

Agent O'Connell's Report does not state Defendant's wife was detained at the gas station. Agent O'Connell's Report states, "prior to [Defendant's wife] leaving the gas station, she provided verbal consent to search the vehicle . . . [a]t this time, a pistol was located under the front passenger seat where RODRIGUEZ was located." Defense Exhibit No. 2, the "ATF Report."

Similarly, Officer Camacho's Report does not state Defendant's wife was detained at the gas station. Officer Camacho's Report details the sequence of events as follows:

> TFO Smith and Officer Camacho followed the Ford SUV to the Circle K gas station located at 3659 E Commerce Street, San Antonio, Texas. The Ford SUV parked at a gas pump and was observed exiting the driver seat and walked into the store. Officer Camacho exited his unmarked departmental vehicle and walked on foot towards the Ford SUV. Officer Camacho identified RODRIGUEZ sitting in the front passenger seat **(TFO's Note: Officer Camacho arrested RODRIGUEZ in April 2021 and was able to positively identify him. Also the distance from the target location to the Circle K is approximately half a mile)**.

Defense Exhibit No. 3, the "DEA Report," at ¶ 4.

>TFO Smith directed members of DEA to move in and detain RODRIGUEZ. Deputy Nate Garza was in in full uniform operating a marked Bexar County Sheriff patrol unit and assisted as uniform presence. ***RODRIGUEZ was removed from the front passenger seat and detained without incident.*** During a pat down search for weapons, RODRIGUEZ was found to be in possession of a clear plastic bag containing approximately 38.8 grams of marijuana. The marijuana was recovered from RODRIGUEZ's front left shorts pocket.

*Id*. at ¶ 5 (emphasis added).

>TFO Smith advised RODRIGUEZ that TFO Smith had a search warrant for 3422 E Commerce, San Antonio, Texas. For safety reasons, TFO Smith asked RODRIGUEZ if anyone was at the location. RODRIGUEZ stated no one was there. RODRIGUEZ was read his Miranda Rights and stated he understood his rights. RODRIGUEZ stated that the key to the location was on his keyring and provided the key to TFO Smith. ***RODRIGUEZ was then placed into a marked Bexar County Sheriff patrol unit and was transported to 3422 E Commerce.*** Members of DEA TAG executed the search warrant while utilizing the key provided by RODRIGUEZ. Once the location was secure, Live Oak PD Officer David Wall conducted a search with his canine. According to Officer Wall, his K9 alerted on numerous locations throughout the location. RODRIGUEZ was brought into the location.

*Id*. at ¶ 6 (emphasis added).

>***As the warrant was executed, ATF SA Kaitlin O'Connell and Officer Camacho interviewed [Defendant's wife] who was still at the Circle K gas station. During the interview, a consensual search was conducted on the Ford Explorer where a Heckler & Kock (HK) Model VP9 9mm semi-automatic handgun bearing serial# 224-215003 was recovered by Officer Camacho underneath the front passenger seat where RODRIGUEZ had been seated. [Defendant's wife] stated that the firearm belonged to RODRIGUEZ.*** Upon further inspection, the firearm contained thirteen (13) 9mm rounds in the magazine but did not have a round in the chamber. The firearm was run through a law enforcement database and was confirmed stolen (reference NIC# G614735554 out of Borne Police Department). ***After the firearm was recovered, [Defendant's wife] was free to leave.*** SA O'Connell and Officer Camacho transported the firearm to 3422 E Commerce where the search of the location had begun.

*Id*. at ¶ 7 (emphasis added).

At the hearing, Officer Camacho, Agent O'Connell, Agent Bryan Smith ("Agent Smith"), and the Defendant testified about the law enforcement officers' interaction with Defendant's wife.

9

### A. Officer Camacho's Testimony

Officer Camacho testified he could not recall if Defendant's wife was handcuffed when she exited the gas station. *Id*. at 28:18-25. He testified it was his role to request consent to search the Explorer from Defendant's wife but could not remember if Defendant's wife was restrained by handcuffs or if she was seated on the curb near the store. *Id*. at 29:24-25–30:16-22. He added, "I just remember getting consent from the driver, hearing the *Miranda* [warnings,] finding the pistol, that's pretty much it." *Id*. at 30:20-21.

### B. Agent O'Connell's Testimony

Agent O'Connell testified Defendant was detained when she arrived on the scene. *Id*. at 40:14-15. Agent O'Connell testified, based on her report, she and Officer Camacho talked to Defendant's wife together. *Id*. at 47:3-6. Agent O'Connell remembers speaking with Defendant's wife outside of the gas station but could not recall if she was ever handcuffed. *Id*. at 40:9-22.

### C. Agent Smith's Testimony

Agent Smith testified Defendant's wife was detained, but he could not recall if she was handcuffed. *Id*. at 76:23-77:1. He further testified Agent O'Connell and Officer Camacho stayed at the gas station with Defendant's wife. *Id*. at 77:6-10.

### D. Defendant's Testimony

Defendant testified his wife was with him in the Explorer. *Id*. at 85:11-13. Defendant testified the Explorer is the family vehicle and he has an ownership interest in the vehicle. *Id*. at 86:13-20. He testified he was present at the gas station when his wife exited the convenience store. *Id*. at 86:23-25. He testified he next saw officers detain her and place handcuffs on her. *Id*. at 87:1-6. Defendant testified officers then placed him and his wife on the curb in front of the gas station. *Id*. 87:7-9. Defendant testified after that he remained at the gas station for approximately

twenty minutes before officers transported him back to the location. *Id*. at 87:12-13. He testified his wife remained restrained until that time. *Id*. at 87:14-16. Finally, he testified officers had their guns drawn when his wife was detained and placed in handcuffs. *Id*. at 87:17-21.

With these facts in mind, the Court must determine whether Defendant's wife's consent was validly given regarding the search of the Explorer. Specifically, the Court must determine (1) whether the consent was voluntary and (2) whether it was an independent act of free will. *United States v. Jensen*, 462 F.3d 399, 406 (5th Cir. 2006). In answering the first question, the Court uses the following factors to determine whether consent was voluntary:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *Id.*

The government bears the burden of proving that consent was voluntary. *Id.* To answer the second question—whether consent was an independent act of free will—the Court considers (1) the temporal proximity of the illegal conduct and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the initial misconduct. *Id*.

As stated above, the Government concedes the initial search and seizure at the gas station was improper. The fact that an illegal detention precedes consent to search a vehicle is not dispositive of the voluntariness of the consent, however. *U.S. v. Kelly*, 981 F.2d 1464, 1471-1472 (5th Cir. 1993). In *Kelly*, the Fifth Circuit considered the lack of coercive tactics by the officers and the fact the consenting party was informed of their right to refuse consent as intervening factors that purge the taint from an illegal detention. *Id*. at 1472. Here, officer detained Defendant's wife, but it is unclear whether she was handcuffed. While Defendant testified his wife was placed in handcuffs, the three officers do not recall if she was so restrained. There is no

additional evidence before the Court of any coercive police procedure or tactics. Indeed, the limited evidence presented regarding the wife's cooperation reflects she cooperated with officers during her interaction with them. The Court notes at the hearing, however, the parties did not present any evidence regarding whether Defendant's wife knew she could refuse the request to search the Explorer. The parties also did not present any evidence regarding Defendant's wife's education and intelligence or her belief that no incriminating evidence would be found if she gave consent to search the Explorer.

Agent O'Connell and Officer Camacho's reports, which were contemporaneously prepared, do not indicate Defendant's wife was detained. In her Report, Agent O'Connell states "prior to [Defendant's wife] leaving the gas station, she provided verbal consent to search the vehicle." Defense Exhibit No. 2, the "ATF Report." Officer Camacho's Report states, "as the warrant was executed, ATF SA Kaitlin O'Connell and Officer Camacho interviewed [Defendant's wife] who was still at the Circle K gas station." Defense Exhibit No. 3, the "DEA Report," at ¶ 7. "During the interview, a consensual search was conducted on the Ford Explorer where a Heckler & Kock (HK) Model VP9 9mm semi-automatic handgun bearing serial # 224-215003 was recovered by Officer Camacho underneath the front passenger seat where RODRIGUEZ had been seated." *Id*. The report also states, after the firearm was recovered, [Defendant's wife] was free to leave." *Id*. It is not clear if Officer Camacho meant Defendant's wife was being held and not free to leave or, because she consented to the search she was free to leave when officers completed their search. Either way, Defendant was not present when officers asked his wife to search the vehicle. Therefore, even if the Court accepted Defendant's testimony that his wife was initially placed in handcuffs as true, his testimony does not lead to the conclusion his wife's consent was not voluntary.

In reconciling the briefing, testimony, and exhibits, the Court is left with the impression, after detaining Defendant at the gas station, officers quickly transported Defendant to the location. Defense counsel's own briefing and the timeline presented at the hearing do not appear to support Defendant's testimony. Defense counsel's Memorandum in Support of Motion to Suppress Evidence, (ECF No. 55-1), indicates officers detained Defendant at the gas station, searched him and found narcotics in his pocket, read Defendant his *Miranda* rights, placed him in a patrol vehicle, and took him back to the location.

At the hearing, Officer Camacho testified the entire encounter at the gas station to the time Defendant was returned to the location was five to ten minutes. Hearing Transcript at 31:1-13. When Defense counsel asked Officer Camacho "[a]nd from the moment that happens, it's just a matter of minutes before Mr. Rodriguez in handcuffs is transported back to the target location?," Officer Camacho responded "[t]hat is correct." *Id*. *Id*. at 31:1-3–31:4. Clarifying, Defense counsel's next question to Officer Camacho was "so from the time of the initial encounter at the gas station until he is removed back to the target location, a half mile [sic] back down Commerce Street to the west, it's just five minutes?" *Id*. at 31:9-12. Officer Camacho answered "[f]ive, ten minutes, that is correct." *Id*. at 31:13.

A portion of defense counsel's cross examination of Agent Smith is also relevant to clarifying the timeline:

> Q. The whole time frame from his detention at the gas station or the convenient store to back to the shop where the search is being conducted that he's being interrogated, that's all less than an hour, right?
>
> A. More than likely, yes, sir.
>
> Q. Okay. And how long does he remain at the location?
>
> A. The entire time.

> Q. How long were y'all there, hour and a half?
>
> A. Based on what you just said, about less than an hour.
>
> Q. And then he was transported by SAPD or sheriff to the county?
>
> A. Still would have been the county.
>
> Q. To the County to be booked?
>
> A. Correct.
>
> Q. So all of this happened from the time the car arrives at the shop on Commerce Street drives to convenient store, there's detention, he's taken back to the location, he's interrogated during the search and then booked, we're talking about from start to finish hour and a half, two hours max?
>
> A. That's correct.

*Id*. at 79:8-80:2.

Finally, a review of Officer Nick Stromboe's ("Officer Stromboe") body camera footage provides important markers for the Court's analysis of the sequence of events. When Officer Stromboe activates the body camera, the time stamp is 8:28:53 a.m. Defendant first appears on the body camera footage at 8:32:24 a.m. The duration of the body camera footage is 43 minutes and 19 seconds. While the body camera footage only begins at the location, this lends support to Agent Smith's testimony the entirety of this event lasted one to two hours.

In sum, the three officers who testified at the hearing have no recollection of Defendant's wife being handcuffed, no recollection of placing Defendant's wife on the curb in front of the gas station, and no recollection of drawing their guns during their interaction with Defendant's wife. *Id*. The only testimony regarding these three facts comes from Defendant, who also testified he was detained at the gas station for twenty minutes before officers transported him back to the target location. Officer Camacho's and Agent Smith's testimony, however, reflects

Defendant being detained at the gas station for a very short period of time before being transported back to the location.

Accordingly, based on the officers' reports and testimony at the hearing, the Court does not find Defendant's testimony regarding the description of his wife's interaction with the officers and his recollection of the overall sequence of events credible. Even if the Court did find Defendant's testimony credible—that he was present at the gas station for twenty minutes and his wife was briefly detained with her hands restrained in front of her—these facts on their own would not render Defendant's wife's consent invalid. After examining all the evidence presented, which is limited in this regard, the Court concludes Defendant's wife voluntarily consented to the search of the Explorer. Accordingly, the firearm found in the Explorer should not be suppressed.

## CONCLUSION

For all the reasons stated above, the Court to **DENIES** the Defendant's Corrected Motion to Suppress. *See* ECF No. 55.

It is so ORDERED.
SIGNED this 12th day of March, 2025.

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE